Filed 8/22/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAN FRANCISCANS FOR LIVABLE NEIGHBORHOODS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant and Respondent. | A141138<br><br>(City & County of San Francisco Super. Ct. No. CGC-11-513077) |

After preparing an environmental impact report (EIR) defendant City and County of San Francisco (City) approved revisions of the housing element of its general plan. San Franciscans for Livable Neighborhoods (SFLN) filed a petition for writ of mandate challenging the adequacy of City's EIR. The trial court denied relief and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*A.*    *The Parties*

SFLN is an unincorporated association that includes several neighborhood organizations: the Cow Hollow Association, the Francisco Heights Civic Association, the Greater West Portal Neighborhood Association, the Jordan Park Improvement Association, the Lakeshore Acres Improvement Club, the Laurel Heights Improvement Association of San Francisco, Inc., the Marina-Cow Hollow Neighbors & Merchants, the Miraloma Park Improvement Club, the Pacific Heights Residents Association, the Presidio Heights Association of Neighbors, the Russian Hill Neighbors, the St. Francis Homes Association, the Sunset-Parkside Education and Action Committee, Inc., and the

1

Westwood Highlands Association. The City is the "lead agency" for the subject approvals for purposes of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] and is charged with duties to disclose, analyze, and mitigate significant impacts from the project. (§§ 21067, 21165.)

## B.    CEQA

Before delving into the facts and procedural history of this matter, it is necessary to discuss the relevant statutory and regulatory framework. CEQA requires an agency to conduct an initial study to determine if a project may have a significant effect on the environment. (Cal. Code Regs., tit. 14,[2] § 15063, subd. (a).) "If there is substantial evidence that the project may have a significant effect on the environment, then the agency must prepare and certify an EIR before approving the project." (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 945.) The EIR is "the heart of CEQA" (CEQA Guidelines, § 15003, subd. (a)), and its purpose is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061; see CEQA Guidelines, § 15003, subds. (b)–(e).)

"CEQA allows public agencies to use special types of EIR's to simplify preparation and avoid duplication. [Citations.] [¶] One of those EIR's is a program EIR. (CEQA Guidelines, § 15168.) 'A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related [among other possibilities [¶] . . . [¶] . . . [a]s individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways.' (CEQA Guidelines, § 15168,

---

[1]    All further statutory references are to the Public Resources Code except as otherwise indicated.

[2]    CEQA Guidelines are codified in title 14 of the Code of Regulations. Hereafter, we refer to title 14 as "CEQA Guidelines."

2

subd. (a)(4).)' " (*Center for Biological Diversity v. Department of Fish and Wildlife* (2015) 234 Cal.App.4th 214, 233 (*Center for Biological Diversity*).) The housing element is such a project.

"Using a program EIR can provide a public agency many advantages as it proceeds with its program. For one, the agency can avoid preparing multiple EIR's for the program and its activities if the program EIR is comprehensive. 'Preparation of a program EIR allows a public agency to characterize the overall program as the project that is proposed for approval. If a sufficiently comprehensive and specific program EIR is prepared, the agency may dispense with further environmental review of activities within the program that are adequately covered by the program EIR. ( [CEQA Guidelines,] § 15168, [subd.] (c).)' [Citation.]" (*Center for Biological Diversity, supra,* 234 Cal.App.4th at p. 233.)

"Program EIR's have other advantages. They may be used to address impacts and mitigation measures that apply to the program as a whole to simplify later environmental review for program activities. (CEQA Guidelines, § 15168, subd. (d) . . . .) They may also be used to consider broad programmatic issues for related actions at an early planning stage when the agency has greater flexibility to deal with basic problems or cumulative impacts. (CEQA Guidelines, § 15168, subd. (d).)" (*Center for Biological Diversity, supra,* 234 Cal.App.4th at p. 233.)

"The CEQA Guidelines do not specify the level of analysis required to be performed in a program EIR. Indeed, '[n]o ironclad rules can be imposed regarding the level of detail required . . . . EIR requirements must be "sufficiently flexible to encompass vastly different projects with varying levels of specificity." [Citation.]' [Citation.] 'The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR.' (CEQA Guidelines, § 15146.)" (*Center for Biological Diversity, supra,* 234 Cal.App.4th at p. 234.)

Therefore, "[d]esignating an EIR as a program EIR . . . does not by itself decrease the level of analysis otherwise required in the EIR. 'All EIR's must cover the same

3

general content.  [Citations.]  The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR.' " (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 533.)  Consequently, in considering a challenge to a program EIR, " 'it is unconstructive to ask whether the EIR provided "project-level" as opposed to "program-level" detail and analysis.  Instead, we focus on whether the EIR provided "decision makers with sufficient analysis to intelligently consider the environmental consequences of [the] project." ' (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1052.)" (*Cleveland National Forest Foundation v. San Diego Association of Governments* (2017) 17 Cal.App.5th 413, 426 (*Cleveland National Forest*).)

## C.     General Plan Requirements

"The Planning and Zoning Law (Gov. Code, § 65000 et seq.) requires each city and county to 'adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning.' (Gov. Code, § 65300.)  A [city's] general plan is its ' " 'constitution' for future development" . . . ' "located at the top of the hierarchy of local government law regulating land use." ' [Citation.]  ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." [Citation.]' [Citation.]  The Planning and Zoning Law requires that each general plan include seven mandatory elements, including a land use element, a circulation element, a housing element, a conservation element, an open-space element, a noise element, and a safety element.  (Gov. Code, § 65302.)" (*Latinos Unidos de Napa v. City of Napa* (2013) 221.Cal.App.4th 192, 196-197 (*Latinos Unidos*).)

## D.     The Housing Element Law

Declaring housing availability to be of "vital statewide importance" and the "attainment of decent housing and a suitable living environment . . . a priority of the highest order," the Legislature enacted the Housing Element Law, which requires local

4

governments to adopt a "housing element" as a component of its general plan.  (Gov. Code, § 65580 et seq., added by Stats. 1980, ch. 1143, pp. 3697-3698, § 3; *Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1183 (*Fonseca*).)  The purpose of the Housing Element Law is, among other things, "[t]o assure . . . cities [will] recognize their responsibilities in contributing to the attainment of the state housing goal," including "housing affordable to low-and-moderate-income households."  (Gov. Code, §§ 65580, subd. (c), 65581, subd. (a).)  A local government's housing element must be reviewed and revised every five to eight years.  (Gov. Code, §§ 65583, 65588, subds. (b), (e).)

The housing element of a general plan must contain specific components, analyses, goals and policies.  (Gov. Code, § 65583.)  The housing element must include, among other things, "[a]n assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs," including an inventory of land suitable for residential development, as well as a program "to implement the policies and achieve the goals and objectives of the housing element." (Gov. Code, § 65583, subds. (a), (c).)

The housing element must also identify actions that will be taken to make sites available to accommodate the local government's share of the regional housing needs.  (Gov. Code, § 65583, subd. (c)(1).)  The Legislature enacted the regional housing needs assessment (RHNA) procedure (see Gov. Code, §§ 65584-65589) to address the state's shortage of affordable housing.  (Gov. Code, § 65580, subd. (a).)  To achieve the state's housing objectives, the law requires each local jurisdiction to zone adequate numbers of sites to accommodate the regional housing burden allocated to it, so that every local jurisdiction shares in the obligation to accommodate the state-wide housing need.  (See Gov. Code, §§ 65584, 65863, subd. (a)).  Various regional councils of governments, in conjunction with the cities and counties within their jurisdictions and the California Department of Housing and Community Development (HCD), devise methods for distributing existing and projected housing needs within their regions and for allocating a share of the regional housing needs to each local jurisdiction.  (Gov. Code, § 65584, subd. (d)(4).)

### E.     *The 2004 Housing Element*

The City revised its housing element in 2004, when it adopted the 2004 Housing Element.  The 2004 Housing Element was an update to the 1990 Residence Element.  The City found the 2004 Housing Element would have no significant adverse environmental impacts and issued a negative declaration, approving the revised housing element without preparing an EIR.  SFLN challenged the City's decision to proceed by negative declaration.  A different panel of this division concluded an EIR was required.  (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (June 22, 2007, A112987 [nonpub. opn.].)  Accordingly, we reversed and ordered the trial court to issue a writ of mandate directing the City to set aside its adoption of the negative declaration and to order the preparation of an EIR.

Following this reversal, the trial court issued an amended preemptive writ of mandate in April 2009.  It enjoined the City from implementing some aspects of the 2004 Housing Element, but allowed the City to operate under the remaining provisions—many of which derived from the previous 1990 Residence Element—until the City complied with CEQA's mandates.  The City formally began preparing the court-ordered EIR analyzing the 2004 Housing Element in October 2008.

### F.     *The 2009 Housing Element*

By the time City began preparing the court-ordered EIR for the 2004 Housing Element, preparation for the next state-required housing element—the 2009 Housing Element—was already underway.  The 2009 Housing Element examined the type, amount, and affordability of new construction needed, as determined by the Association of Bay Area Governments (ABAG).  ABAG, in coordination with HCD, determined that San Francisco's fair share of the regional housing for January 2007 through June 2014 would be 31,190 units, or about 4,160 units per year.  The stated goal was to "alleviate a tight housing market[,]" with allocations of "regional household and employment growth" to areas with established or planned transit infrastructures.  The 2009 Housing Element, based on the RHNA, was designed to address housing needs for a range of household income categories.  A total of 18,880 units, or 61 percent of the RHNA target

6

(31,190 units) were required to be affordable to households making 120 percent of the area medium income or less (or $113,150 for a household of 4).

The stated intent of the 2009 Housing Element was to provide the policy framework for guiding the City to meet its housing goals. As such, the 2009 Housing Element did not modify land use, specify areas of increased height or density, suggest specific controls for individual neighborhoods, implement changes to the Zoning Map or Planning Code, or direct funding for housing development. Rather, the 2009 Housing Element focused on strategies for implementing its core "housing values," which the City developed after working with neighborhood groups, community organizations, housing advocates, and residents. The following four core housing values were created to guide the 2009 Housing Element: 1) prioritize permanently affordable housing; 2) recognize and preserve neighborhood character; 3) integrate planning of housing, jobs, transportation, and infrastructure; and 4) cultivate the City as a sustainable model of development.

The 2009 Housing Element acknowledged the inherent tension among many of its housing goals. For example, the relationship of market rate to affordable housing could often be competitive and oppositional. Also, the demand for more housing in San Francisco creates tensions by the impact, either real or perceived, of new developments on existing neighborhoods. Another major issue to balance is the relationship between housing and infrastructure. The stated purpose of the 2009 Housing Element is not to resolve all of these tensions, but to provide a framework the City could use to identify concerns that should be considered by decision makers in order to achieve the City's housing goals.

In an effort to assist the City in reaching the type and amount of housing targeted by the RHNA, the 2009 Housing Element provides a set of objectives and policies to address the State's goals and the City's most pressing housing issues: identifying adequate housing sites, conserving and improving existing housing, providing equal housing opportunities, facilitating permanently affordable housing, removing government constraints to construction and rehabilitation of housing, maintaining the unique and

7

diverse character of San Francisco's neighborhoods, balancing housing construction with community infrastructure, and sustainability.

### G. The Combined Environmental Review of the 2004 and 2009 Housing Elements

Due to the overlap in preparing the 2004 and 2009 Housing Elements, the City combined the environmental review of the housing elements.

The City certified the 2004 and 2009 Housing Element EIR (Housing Element EIR or EIR) on March 24, 2011. In certifying the EIR, the City planning department notified the public that the 2009 Housing Element, by encouraging housing near transit lines, will have a single, significant, unavoidable environmental impact on transit that cannot be mitigated to a level of insignificance; it is estimated that transit ridership could rise in excess of the San Francisco Municipal Railway's (MUNI) capacity utilization standard of 85 percent.

On June 29, 2011, the City adopted the 2009 Housing Element as San Francisco's new housing element. On August 4, 2011, SFLN filed a petition for writ of mandate challenging the EIR as it pertained to the 2009 Housing Element, claiming, among other things, that the adoption of the 2009 Housing Element was internally inconsistent with the City's General Plan.

The trial court issued an order finding that, in most respects, Housing Element EIR complied with CEQA. The court upheld the project description, the impact analyses, and the City's decision not to recirculate the EIR after it was published, and determined that the EIR included a reasonable range of alternatives. The court, however, ruled that the EIR's analysis of the alternatives and the findings regarding potentially feasible mitigation measures were inadequate and not supported by substantial evidence. Finally, the court found that the 2009 Housing Element was consistent with the General Plan and the Planning Code.

The instant appeal followed.

## II. DISCUSSION

SFLN challenges the Housing Element EIR's compliance with CEQA on numerous grounds, including the use of improper baselines when analyzing impacts,

8

failure to disclose various potential impacts, and failure to consider feasible alternatives that would reduce significant impacts.

## A.     *Standard of Review*

"[T]he Legislature intended [CEQA] 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)  "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] . . . An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.]  The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.]  Because the EIR must be certified or rejected by public officials, it is a document of accountability.  If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.  [Citations.]  The EIR process protects not only the environment but also informed self-government." (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

"Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 (*Sierra Club*).)  Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  As a result of this standard, "[t]he court does not pass upon the correctness of the EIR's environmental

conclusions, but only upon its sufficiency as an informative document." (*Laurel Heights, supra,* 47 Cal.3d at p. 544.)  We will not set aside an agency's approval of an EIR on the ground that a different conclusion would have been equally or even more reasonable. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.)

Our review in a CEQA case, as in other mandamus actions, is the same as that of the trial court.  We review the agency's decision, not that of the trial court.  (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162.)  This review differs according to the type of error claimed.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.)  "Whether an 'agency has employed the correct procedures,' is reviewed 'de novo . . . "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation] . . . .' [Citation.]  But an 'agency's substantive factual conclusions' are 'accord[ed] greater deference.' [Citation.]  'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." [Citation.]' " (*Sierra Club, supra,* 163 Cal.App.4th at p. 531.)  "Rather, we must resolve any reasonable doubts and any conflicts in the evidence in favor of the agency's findings and decision.  [Citations.]" (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 276.)

Further, " '[i]n determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project.  ([CEQA Guidelines,] § 15151.) The CEQA Guidelines further provide that "the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible . . . .  The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." ([CEQA Guidelines] § 15151.)' [Citation.]  The overriding issue on review is thus 'whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public to discern from the [EIR] the "analytic route the . . .

10

agency traveled from evidence to action." [Citation.]' [Citation.]" (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262.)

**B.      Baseline Conditions**

SFLN contends the Housing Element EIR improperly analyzed the environmental impacts by using the future conditions projected by ABAG, rather than analyzing the existing conditions.

CEQA requires an EIR to "focus on impacts to the existing environment, not hypothetical situations." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955.) "[T]he impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, . . . ." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321 (*Communities*).)

To accomplish this, CEQA directs an EIR to include what is called an environmental baseline, a description of the project site's physical and environmental conditions at the time the EIR is prepared. "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published . . . from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (CEQA Guidelines, § 15125, subd. (a).)

"[A]n inappropriate baseline may skew the environmental analysis flowing from it, resulting in an EIR that fails to comply with CEQA." (*Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 557 (*Citizens for East Shore Parks*); see also *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87.) The "normal[ ]" rule is that the baseline must reflect the "physical conditions existing at the time [the] environmental analysis" begins. (*Communities, supra,* 48 Cal.4th at pp. 320, 323.)

However, " 'the date for establishing a baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.' [Citation.]" (*Communities*, *supra,* 48

11

Cal.4th at pp. 327-328; see also *San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 218-219 [five-year average of mining volumes was appropriate baseline].)  Thus, "despite the CEQA Guidelines' reference to . . . the time environmental analysis is commenced' [citation], '[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline.  Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence.'  [Citation.]"  (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 449 (*Neighbors for Smart Rail*).)

In *Neighbors for Smart Rail*, our Supreme Court addressed the question of whether an agency has discretion to use projected future conditions, rather than existing conditions, as a baseline.  (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 452.)  There, an EIR for a project had exclusively employed an analytic baseline of conditions in the year 2030 to assess a project's likely impacts on traffic congestion and air quality.  (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 445.)  After reviewing appellate authority on the propriety of using future conditions as a sole baseline, the court announced the following rule: "Projected future conditions may be used as the sole baseline for impacts analysis if their use in place of measured existing conditions—a departure from the norm stated in [CEQA] Guidelines section 15125[, subdivision (a)]— is justified by unusual aspects of the project or the surrounding conditions.  That the future conditions analysis would be informative is insufficient, but an agency does have discretion to completely omit an analysis of impacts on existing conditions when inclusion of such an analysis would detract from an EIR's effectiveness as an informational document, either because an analysis based on existing conditions would be uninformative or because it would be misleading to decision makers and the public."  (*Neighbors for Smart Rail, supra,* 57 Cal.4th at pp. 451-452; see also *id*. at p. 457.)

12

Therefore, in appropriate circumstances an agency may "adjust its existing conditions baseline to account for a major change in environmental conditions that is expected to occur before project implementation. In so adjusting its existing conditions baseline, an agency exercises its discretion on how best to define such a baseline under the circumstances of rapidly changing environmental conditions." (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 452.) For example in *Neighbors for Smart Rail,* the court explained that "in an EIR for a new office building, the analysis of impacts on sunlight and views in the surrounding neighborhood might reasonably take account of a larger tower already under construction on an adjacent site at the time of EIR preparation." (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 453.) The court also noted that an agency's determination that an existing conditions impact would provide little or no relevant information or would be misleading as to a project's true impacts is reviewed for substantial evidence. (*Id.* at p. 457.)

### 1. *Traffic and Water Baseline*

SFLN contends that the City improperly used population projections as a baseline to analyze traffic and water impacts, and that ABAG's 2009 population projections were inappropriate because these population projections "assume that the type of policy changes included in the Housing Element will be made."

SFLN claims the EIR improperly uses hypothetical conditions in the year 2025 as a baseline for measuring traffic and water impacts. The EIR compares expected traffic impacts in the year 2025. It also contains information about actual, observed traffic conditions at 60 intersections collected by TJKM Transportation Consultants in June 2010. In fact, the EIR has a chart that compares existing traffic conditions at these 60 intersections with projected traffic in 2025, giving a grade between A and F to each intersection in each scenario, with E and F representing unsatisfactory conditions.

The EIR notes that although traffic is expected to get worse, the Housing Element itself does not generate any new person trips. Rather, the EIR explains that "[r]esidential growth within the City would occur regardless of the proposed Housing Element[]; the

13

Housing Element[] would provide direction for how new residential development in the City should occur, with an emphasis on affordability."

As for water, the EIR identifies existing water demand, and analyzes whether Housing Element policies would result in the need for additional water beyond what is provided by existing entitlements and resources. The EIR explains that the Housing Element does not propose new development. Rather, it is a "policy-level" document intended to guide how and where new residential development in the City should occur. The EIR, based on the 2009 San Francisco Public Utility Commission's (SFPUC) Water Supply Availability Study (WSAS), calculated water demand projections for the City based on housing and employment forecasts. Specifically, the EIR compares 2030 growth projections between the 2005 Urban Water Management Plan and the 2009 growth projections developed by the San Francisco Planning Department (Planning Department), and also takes into account projects currently in various stages of the development pipeline. Based on these projections, new residential growth is expected to increase by 29,787 units. Although the changes in the Housing Element encourage housing density measures, the EIR recognizes that higher density housing uses less water than single family homes. The Housing Element also includes policies to ensure that the new housing is adequately supported by infrastructure, including water. The EIR further explains that although the Housing Element would not result in the construction of residential units, all new development would be required to comply with existing regulations. Accordingly, the EIR concludes that the Housing Element policies would not result in an increase in water demand beyond those assumed in the WSAS.

SFLN claims that the City's use of "inflated" 2025 conditions constituted an "analytical sleight of hand." According to SFLN, by using a future baseline, the City "skipped over analyzing the foreseeable impacts of approving the very same increased-density policies" that the ABAG 2025 projections assume will be enacted. We disagree. Rather, we conclude the City was within its discretion to adopt a baseline calculation forecasting traffic and water impacts in 2025, rather comparing the existing conditions with and without the Housing Element.

14

*POET, LLC v. State Air Resources Board* (2017) 12 Cal.App.5th 52 (*POET II*), on which SFLN relies, does not compel a contrary conclusion. In *POET,* an EIR that used an alternative baseline was deemed inadequate, in part because the state agency took an overly narrow view of the project. (*Id.* at p. 77.) At issue was the agency's enactment of low carbon fuel standards (LCFS) regulations. (*Id.* at pp. 56-57.) When the agency adopted the original LCSF regulations in 2009, a prior appellate decision (*POET, LLC v. State Air Resources Board* (2013) 218 Cal.App.4th 681 (*POET I*) found the agency had violated CEQA. (*POET II, supra,* 12 Cal.App.5th at p. 57.) The appellate court required the agency set aside its approval of the LCFS regulations and address whether the project would have a significant adverse effect on the environment as a result of increased nitrogen oxide (NOx) emissions caused by biodiesel. (*Id.* at pp. 64-65.)

In the subsequent rulemaking, the agency conceded that increased use of biodiesel in California since the adoption of the original LCFS regulation resulted in "increased NOx emissions of about 1.2 tons per day." (*POET II*, *supra*, 12 Cal.App.5th at 68.) The agency also conceded "biodiesel '[had] been incentivized under the existing LCFS Regulation beginning in 2009.' " (*Id.* at 98.)

Instead of recognizing and analyzing the LCFS regulation's contribution to the increase in NOx emissions caused by biodiesel, the agency in *POET II* sidestepped the issue by taking the position that its "readopted" LCFS regulation was an entirely "new" regulation, and that it need not analyze those impacts because the original LCFS regulation was a different "project" than the readopted LCFS regulation. (*POET II*, *supra*, 12 Cal.App.5th at pp. 59-60, fn. 4, 72.) Based on this position, the agency contended the environmental baseline was 2014–i.e., the year the agency began the environmental review process for the "readopted" LCFS regulation. (*Cf.* CEQA Guidelines, § 15125, subd. (a).) (*POET II*, *supra*, at p. 77.) Advancing a contrary position, the plaintiffs argued that the 2014 baseline was a " 'regulatory sleight of hand' [that] conceals the fact that California will continue to experience increased NOx emissions causes by the original LCFS regulation until at least 2021." (*Ibid.,* fn. omitted.) The plaintiffs further argued the 2014 baseline "skewed the analysis of the

impact of *future* NOx emissions by comparing predicted future emissions to a baseline made higher by the NOx emissions caused by the original LCFS regulations . . . ." (*Id.* at p. 72.)

In resolving this dispute, the court in *POET II, supra,* 12 Cal.App.5th 52, explained that the question of what constitutes an appropriate baseline cannot be resolved without the proper application of the term " 'project' " to the facts of a case. (*Id.* at p. 77.) "When the whole of a project is properly identified, then the conditions of defining the project's baseline can be determined." (*Ibid.*) There, the court concluded that the agency's "interpretation of 'project' was too narrow and, consequently it chose the wrong year as the conditions for establishing the baseline for NOx emissions." (*Ibid.*) In so holding, the court reasoned that the "project" that the agency needed to evaluate under CEQA included both the original LCFS regulation and the readopted LCFS regulation, as the two actions were " 'related to each other.' " (*Id.* at pp. 74-75.)

Here, SFLN argues that the City, like the agency in *POET II*, relied on an improperly narrow view of the Housing Element to support its reliance on a future baseline when evaluating traffic and water supply impacts, assuming the growth the policies are intended to induce would occur regardless of the Housing Element. According to SFLN, by utilizing this truncated view of the project, the EIR sidestepped review of the reasonably foreseeable indirect physical changes in the environment " 'which may be caused by the project' " as required by CEQA Guidelines section 15064, subdivision (d), under the guise that the increased traffic and water supply impacts would occur as a result of the projected population growth, with or without the Housing Element policies. The Housing Element, however, is not designed to *induce* population growth, and is distinguishable from cases where approvals of projects clearly would result in population growth in previously undeveloped areas. (*Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1345, 1347-1348 [approval of 21-house project in area with limited services]; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 352, 371 [development of airport industrial area expected to add nearly 10,000 employees to area].)

16

SFLN's principal claim is that the Housing Element will lead to increased growth in the City with consequent environmental impacts. This is not a baseline or project description argument. It is a causal argument. It is premised on the isolation of the increased-density policies from the causes of population growth, which are a multi-faceted product of births, deaths, migration, household size, labor force participation rates, and job growth over the next 20 years.

Here, the City did not simply decline to consider the impacts by saying the growth was inevitable. Rather, the City engaged in considerable discussion of projected growth and analyzed the traffic and water supply impacts based on these projections. This is what CEQA requires. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors, supra,* 91 Cal.App.4th at p. 371.) The Housing Element consists of growth-accommodating rather than growth-inducing policies. (See, e.g., *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 877 [water diversion project was "designed to accommodate the projected population growth of the eight cities and counties . . . as that growth is forecast under the general plans for these cities and counties"]; *Merz v. Board of Supervisors* (1983) 147 Cal.App.3d 933, 939, disapproved on another point in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2 [project was "designed only to accommodate the anticipated . . . traffic" from project previously approved]; *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 412 [" 'if the [area plan] were not built as planned, residents would still come to live in the area[ ]].' "])

SFLN insists the baseline analysis was inadequate because the City has failed to establish that use of existing conditions would result in a misleading assessment of traffic and water supply impacts. A determination that an existing conditions analysis would be misleading or without informational value is primarily factual and must be upheld if supported by substantial evidence. (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 457.) The EIR analyzes likely future conditions in the context of current ones and concludes there will be no immediate increase in traffic or water demand in the short-term. SFLN's disagreement with the EIR's analysis is insufficient to establish that the

17

City abused its discretion in utilizing a future baseline. (*San Francisco Baykeeper, Inc. v. State Lands Com., supra,* 242 Cal.App.4th at p. 219.) It would be absurd to ask the City to hypothesize the impacts of a long-term housing plan taking hold immediately. When an amendment to a general plan takes a long view of city planning, the analysis of the amendment's impacts should do so as well. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1573-1574.)

2. *Land Use and Visual Resources Baseline*

SFLN contends the EIR makes a further error in its baseline analysis by relying on the maximum allowable density and height requirements, set forth in the Housing Element as the baseline for land use and aesthetic impacts, instead of the existing physical environment. Despite SFLN's contrary assertion, the EIR does compare the changes in the Housing Element to the existing environment, including existing height limits and densities. For instance, the EIR describes existing land uses in the Inner and Outer Sunset as "generally consist[ing] of low density residential (including a large proportion of single-family detached houses) and small scale commercial uses." "The western portion of the Inner Sunset Planning District is comprised mainly of RH-1[(House-One Family)] and RH-2 [(House-Two Family)] land uses with a strip of NC [(Neighborhood-Commercial]) along Irving Street." In Bayview/Hunters Point, "industrial, residential and other buildings tend to have lower heights, rarely over three stories." The EIR describes existing land uses in the Richmond area as "mainly comprised of RH-1 [(House-One Family, Detached Dwelling)], RH-2 [(House-Two Family)], RM-I [(Mixed [Apartments and Houses])] and NC [(Neighborhood Commercial)] concentrated along Geary Boulevard, Balboa Street, and Clement Street." Land uses in the Marina are described as "generally characterized by public lands and open space, low density, and two- to three-story residential buildings (including a large proportion of single family homes), mixed residential, and moderate scale neighborhood commercial. Neighborhood Commercial land uses are located along Union Street, Fillmore Street, and Lombard Street. Public land uses are prominent along the northern

18

border of the Planning District with Fort Mason, Marina Green, and the Aquatic Park bordering the San Francisco Bay."

Comparing the existing environment to the changes proposed in the 2009 Housing Element, the EIR determines that "incremental increases in residential density in those areas that permit residential uses would not substantially change the existing land use character." The EIR explains that adding residential units to areas with existing residential uses would not result in a substantial change in land use that would be considered a significant environmental impact.

SFLN insists that comparison of the Housing Element only to potential future conditions discussed in the plan is improper. Citing *San Joaquin Raptor Rescue Center, supra,* 149 Cal.App.4th 645, SFLN argues that the "baseline environmental setting must be premised on realized physical conditions on the ground, as opposed to merely hypothetical conditions allowable under existing plans." (*Id.* at p. 658.) *San Joaquin Raptor Rescue Center*, however, does not stand for the proposition that an EIR must always compare a project's impacts to the existing physical environment. Rather, *San Joaquin Raptor Rescue Center* acknowledges that environmental conditions " 'may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.' " (*Ibid.*) In any event, *San Joaquin Raptor Rescue Center* is distinguishable because it did not involve a program EIR. Indeed, SFLN's approach runs afoul of the tiering scheme expressly authorized by CEQA and its implementing regulations. Under this approach, where a local agency has already prepared a program EIR, it need not prepare a subsequent one in connection with later activities unless those activities would have effects that the program EIR did not examine. (CEQA Guidelines, § 15168, subd. (c)(1).) The relevant question is whether new significant environmental effects or a substantial increase in the severity of previously identified significant effects will result from a substantial change to the project. (§ 21166; CEQA Guidelines,

19

§ 15162.) Comparison to theoretical impacts is generally necessary to answer this question.[3]

The baseline is not hypothetical, (*c.f. Communities for a Better Environment, supra,* 48 Cal.4th at p. 322), but based on observation of existing conditions. It is not based on potential increases in housing. Instead projections of future development, to measure likely impacts, derive from this baseline.

## C.      *The EIR's Analysis of Environmental Impacts*

"An EIR shall identify and focus on the significant environmental effects of the proposed project." ([CEQA] Guidelines, § 15126.2, subd. (a).) A significant environmental effect is " 'a substantial, or potentially substantial, adverse change in the environment.' ([]§ 21068; see also [CEQA] Guidelines, § 15382.) ' "Environment" means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' ([]§ 21060.5; see also [CEQA] Guidelines, § 15360.)" (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473, fn. omitted.)

Even if a project's impact may be "individually limited" this impact may be "cumulatively considerable," and an EIR "shall discuss" these impacts. (§ 21083, subd. (b)(2); CEQA Guidelines, §§ 15065, subd. (a)(3), 15130, subd. (a).) " '[C]umulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (§ 21083, subd. (b)(2); CEQA Guidelines, § 15065, subd. (a)(3).)

---

[3]      In supplemental briefing, SFLN asserts that the availability of various CEQA exemptions for affordable housing projects "undermines the City's reliance upon deferring CEQA review until individual housing projects are proposed for approval." (See, e.g., § 21159.21; Gov. Code, § 65913.4.) The availability of CEQA exemptions is not relevant to the disposition of the issues on appeal. In any event, the City would still be required to comply with applicable zoning laws for any new housing projects. (See § 21159.21, subd. (a); Gov. Code, § 65913.4, subd. (a)(5).)

An agency decision to not identify an impact as significant is reviewed for substantial evidence. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 281-282.)

1.      *Land Use and Visual Resource Impacts*

SFLN challenges the EIR's conclusion that the Housing Element would have a less than significant impact on land use and visual resources. According to SFLN, substantial evidence does not support the claim that potential impacts would be "eliminated." Elimination of potential impacts, however, is not the standard. Indeed, "[a] less than significant impact does not necessarily mean no impact at all. [Citation.]" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 899.) Further, we bear in mind that we " 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated.' " (*Id.* at p. 900.)

Here, the EIR discusses the Housing Elements impacts related to the City's visual character in two sections: land use and aesthetics. Starting with land use and planning, the EIR concludes that changes in the Housing Element would not significantly "conflict with any applicable land use plans, policy or regulations." The EIR, however, acknowledges that the changes to the Housing Element could result in impacts related to conflicts with existing land use policy if they resulted in housing development not consistent with the zoning and land use designations as outlined in governing land use plans and/or the City's Planning Code, to the extent those regulations help to avoid or mitigate potential environmental impacts. The EIR notes that the Housing Element does not amend any applicable area plan or planning coded designations, and provides that future specific development would continue to be governed by applicable land use plans and regulations.

Similarly, in its discussion of aesthetics, the EIR acknowledges that the Housing Element policies that encourage increased density in certain areas could encourage

21

buildings that were taller and bulkier than their surroundings, and therefore could potentially affect the visual character of an area. However, the EIR concludes that this impact would be less than-significant for several reasons: the Housing Element does not propose any increases in zoning controls, and it would be impossible to predict where such buildings might be located, or what impact they might have at a particular location. (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1450.) Moreover, under the 2009 Housing Element any new residential project would be required to comply with the Planning Code's Residential Design Guidelines and the General Plan's Urban Design Element, both of which are designed to prevent new development that is out of scale or character from existing development, as well as San Francisco Administrative Code Chapter 35, requiring, among other things, additional review of a residential development's consistency with an industrial area.

The EIR explains that impacts to existing character could also result if development was out of scale with existing development in a neighborhood, or if the new development is so different it would change the existing character of the areas. The EIR also acknowledges some of the changes in the Housing Element policies could direct residential growth to specific areas and promote increased densities in these areas. However, the EIR identifies numerous policies that encourage the maintenance of existing neighborhood character, thereby reducing any potential for new development to have a significant impact on land use or visual resources. For example, Policy 11.1 promotes housing that respects existing neighborhood character. Policy 11.2 notes that "[n]ew and substantially altered buildings should be designed in a manner that, conserve and respect neighborhood character." Policy 11.3 states: "Ensure growth is accommodated without substantially and adversely impacting existing residential neighborhood character." Finally, Policy 11.5 cautions decision makers to "[e]nsure densities in established residential areas promote compatibility with prevailing neighborhood character."

SFLN argues the Housing Element policies substantially weaken the 1990 Residence Element policies, and thus, the EIR's claim, that the new policies would

22

address any neighborhood compatibility impacts, is without support. For example, SFLN claims that the 1990 Residence Policy 12.4 used "objective language" calling for "conserving" for existing neighborhood character, while the 2009 Housing Element calls for merely "respecting" existing neighborhood character, which SFLN argues is a "lesser, subjective standard . . . ." We disagree.

SFLN's reliance on *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398 is misplaced. In *City of Redlands,* an initial study was deemed inadequate where the county failed to cite any evidence in support of its conclusion that the project would have no impact or less than a significant impact. (*Id.* at p. 408.) Instead, the county merely checked the appropriate boxes and provided the same evaluation for each environmental factor with slight variations. (*Ibid.*) In reversing, the court characterized the county's efforts as " 'a token observance of regulatory requirements.' " (*Id.* at p. 409, fn. omitted.)

The same cannot be said of the City's efforts in the instant case. The City prepared an EIR and the EIR notes the differences in the language of the housing policies, as well as notes the overall context of the policies within the Housing Element. The EIR reasonably determined that, overall, the differences in the language did not, in fact, result in a significant impact on the environment. We will not second-guess the City's interpretation of its own general plan policies. (See *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 508.)

SLFN further argues that other 2009 Housing Element policies "substantially weaken[]" the 1990 Residence Element, and as such the EIR's claims that any neighborhood compatibility impacts would be addressed are without support. Again, we disagree. For example, SFLN claims that the 2009 Housing Element Policy 11.5 merely "promote[s]" compatibility with neighborhood character by maintaining prevailing density height and bulk patterns, whereas the 1990 Residence Element sought to "conserve[ ]" neighborhood character (Policy 12-4), "respect[]" established architectural characteristics (policy 2-1), and adopt specific zoning districts that "conform" to a generalized residential land use and density plan. SFLN faults the 2009 Housing Element

23

Policy 11.3 for merely "defer[ing] to the prevailing height and bulk of the area" in established residential areas, instead of conserving (1990 Residence Element Policy 12-4) and maintaining existing densities (1990 Residence Element Policy 2-4). SFLN also takes issue with 2009 Housing Element Policy 11.8, which only "considers" a neighborhood's character when integrating new uses, instead of conserving the character.

"[I]t is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence. [Citations.]" (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719-720.)

Here, the EIR reasonably concludes that overall, the 2009 Housing Element would not have a substantial impact on visual resources or neighborhood character. The 2009 Housing Element did not change allowable land uses or increase allowable building heights; also most growth would occur in adopted plan areas where housing was determined to be appropriate. The EIR explains that by encouraging residential uses in areas where they are already allotted and existing would not substantially change the land use character of an area.

The EIR concludes that adding housing within mixed-use areas[4] would not result in substantial changes to land use character. Finally, as mentioned any new residential project would be required to comply with comply with applicable zoning and planning laws.

---

[4] The EIR includes two maps illustrating that the majority of neighborhoods in the City are located in close proximity to commercial and mixed-use districts.

## 2. *Traffic Impacts*

SFLN asserts that the EIR failed to disclose potentially significant traffic impacts of three other projects that were under environment review at the same time as the Housing Element. The EIR indicates that Treasure Island, Candlestick Point-Hunters Point and Parkmerced were (then) ongoing redevelopment plans or development agreements, and were currently undergoing environmental review. The EIR identifies these three major projects as comprising approximately half of the pipeline projects.

Contrary to SFLN's contention, the City was not required to study these in-the-pipeline projects as they are already subject to their own CEQA and EIR process. In fact, another panel of this Division upheld the Treasure Island EIR (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1043) and our colleagues in Division Two of this judicial district upheld the Parkmerced EIR (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 505).

This case is not akin to *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, cited by SFLN. There, the city simultaneously pursued four downtown high-rise projects and produced EIRs for each project that unlawfully ignored the likely impacts of the other three. (*Id.* at pp. 67-68, 80-81.) That case did not involve tiering development projects atop broader land use planning, which is what the City has done here. In no sense has the City " 'precluded informed decisionmaking and informed public participation.' " (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.) In fact, the pipeline projects were included in the cumulative 2025 traffic conditions. As mentioned, the EIR analyzes 60 intersections *throughout* San Francisco (including in the challenged development areas), and compares existing traffic conditions with projected traffic in 2025. In this respect, the Housing Element EIR is distinguishable from the EIR in *City of Hayward v. Board of Trustees of California State University* (2015) 242 Cal.App.4th 833, cited by SFLN. There, the EIR made no attempt to determine existing usage of

25

adjacent parklands or the estimated increased usage, and provided no information as to the overall capacity of neighboring parks. (*Id.* at p. 859.)

Here, the EIR justifies its conclusion of no significant impact, explaining that although some policies could result in certain areas experiencing greater levels of congestion, policies that encourage a reduction in vehicle miles traveled—such as locating housing near jobs and transit—could improve projected 2025 conditions over what would be expected without those policies.

*3.        Water Supply Impacts: Long-Term Supply and Recirculation*

SFLN argues that the EIR failed to disclose water supply uncertainty and to adequately analyze long-term water supply impacts. SFLN claims the speculative nature of available water is exacerbated by new information that became available after the Draft EIR was circulated for review. SFLN maintains this new information required recirculation of the EIR.

a.        The EIR Adequately Analyzed Water Supply Impacts

SFLN argues that the EIR fails to disclose water supply uncertainty and restrictions. SFLN asserts that the Housing Element is "the necessary first step towards significant increases in the City's population and subsequently the City's water supply demand." However, as discussed the City's projected population increase is not due to the changes in the Housing Element. The Housing Element serves as the policy basis for approving projects with increased residential density as a growth-accommodating rather than growth-inducing measure.

The EIR reasonably relies on the SFPUC's WSAS, which concludes that water demand from projected population increases through 2030 would not exceed supply. The WSAS and EIR note that after 2030, demand could exceed supply in a multi-year dry event,[5] and that if it did, the SFPUC would impose water rationing.

---

[5]        Multiple dry-year event is defined as a three-year hydrological condition of below normal rainfall per the Urban Water Management Planning Act.

The EIR compares the changes in the Housing Element policies with the 1990 Residence Element policies, and determines that they would have sufficient water supply from "existing entitlements and resources and [that no] new or expanded [ ] entitlements" would be necessary.  The EIR concludes that the changes in the Housing Element policies would not significantly impact water demand for several reasons: the WSAS indicates that water would be available to meet demand, including projected population growth through 2030; that the changes in the Housing Element policies were not substantial, particularly when the policies were taken as a whole; that denser development would have less water demand than single family homes; that new development would be required to comply with numerous water-saving requirements, such as the City's Green Building Ordinance and Green Landscaping Ordinance; and that other Housing Element policies ensure that new housing is supported by adequate infrastructure, including Policy 12.3 (ensure new housing is supported by the public infrastructure) and 13.4 (promote "green" development in housing).

The EIR acknowledges that future projects would provide an additional 10 million gallons per day (mgd) of water under the SFPUC's Water Supply Improvement Program ("WSIP").  Although not yet realized, these projects and water sources are "considered secure," as the WSIP is backed by a $4.6 billion bond measure approved by the voters in 2001.  All the projects identified as supplying the additional water were funded and approved programmatically in the WSIP EIR, and were in various stages of implementation.[6]  The WSAS also reasonably assumed demand would be reduced due to conservation measures, as water demand has historically decreased over time, due to improvements in plumbing codes and retrofits of water infrastructure.

---

[6]     To the extent, SFLN faults the Housing Element EIR for failing to include in the administrative record the WSIP EIR referenced in the SFPUC Memorandum, any error was not prejudicial.  The omission of the WSIP EIR did not preclude informed decision-making and informed public participation, or otherwise thwart the statutory goals of the EIR process.  (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 463.)

The EIR's analysis of water supply impacts was appropriate for a general plan or program EIR, in that it provided decision makers with sufficient analysis to consider the environmental consequences of the revisions. (*Cleveland National Forest Foundation, supra,* 17 Cal.App.5th at p. 426.) The Housing Element, as a policy document for implementing change, is not required to establish a *likely* source of water. As the California Supreme Court emphasized in *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 434, "the burden of identifying likely water sources for a project *varies with the stage of project approval involved*; the necessary degree of confidence involved for approval of a conceptual plan is much lower than for issuance of building permits." (Italics added.) Contrary to SFLN's contention, the EIR was not required to analyze long-term water supply impacts past 2030. "The ultimate question under CEQA . . . is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project. If the uncertainties inherent in long-term land use and water planning make it impossible to confidently identify the future water sources, an EIR may satisfy CEQA if it acknowledges the degree of uncertainty involved, discusses the reasonably foreseeable alternatives—including alternative water sources and the option of curtailing the development if sufficient water is not available for later phases—and discloses the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact. (§ 21100, subd. (b).)" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 17 Cal.App.5th at p. 434.) The EIR satisfies CEQA. The WSAS acknowledged the possibility of a post-2030 water supply during a multiple year dry event. In the event of a post-2030 shortfall, the EIR notes that the SFPUC has in place a reduction plan to balance supply and demand. The SFPUC's increased water rationing plan has already received final review and has been determined to pose no significant environmental impacts.

In sum, the EIR adequately addresses the reasonably foreseeable impacts of supplying water to the future housing proposed by the Housing Element. The City

28

reasonably relied on the information in the WSAS, and the EIR's finding that impacts to water would be less than significant is supported by substantial evidence.

   b.  Recirculation Was Not Required

SFLN claims that significant new information was disclosed in a March 14, 2011 memorandum from the SPUC (SPUC Memorandum), which required recirculation. The SPUC Memorandum, issued after publication of the Final EIR, but prior to certification, updated the WSAS, indicating that the possible water deficit anticipated after 2030 could come about sooner (between 2013 and 2018) due to a decreased amount of water available from three creeks.[7]

As discussed, the EIR and the WSAS already acknowledge that demand might not meet supply after 2030 during multiple dry-year events. The EIR also identifies options to address this shortfall, specifically rationing, which has been determined not to have significant environmental impacts. Also, in the Final EIR the Planning Department comprehensively addresses the SPUC Memorandum and its proposed options to address any potential shortfalls. The Planning Department noted that the WSAS was based on a model that included certain assumptions for water demand and supply, and that the (then) current water demand was lower than the assumptions in the model, as was the use of the available supply. For example, the model assumed 91.8 mgd but current demand was 81.8 mgd, and deliveries of 227 mgd were below projected 265 mgd. The Planning Department concluded that if this lower-than-projected demand level persists, then any potential shortfalls from restrictions in water supply from the three creeks, would not affect the SFPUC's ability to meet the adopted WSIP supply objectives through 2018. The Planning Department further noted that even if the supply could not meet demand prior to 2030 in multiple dry-year event, the SFPUC would institute slightly increased rationing, which did not have any environmental impacts.

---

[7]  Due to various dam projects, a potential decrease in available supply for the Alameda, San Mateo, and Calaveras Creeks was projected.

SFLN's disagreement with the Final EIR's analysis is insufficient to establish that the City abused its discretion in determining that recirculation was not required.[8]

### 4. Impacts of Serving Regional Goals

SFLN argues that the EIR fails to analyze the impacts of serving regional goals. The stated goals of the Regional Livability Footprint Project, which is a component of ABAG's Land Use Policy Framework for the San Francisco Bay Area, are "to develop a preferred land use pattern, provision of adequate affordable housing, improved mobility, environmental protection, and open space preservation." The EIR states that the policies of the Housing Element would not conflict with the fundamentals of this framework. The EIR explains that many of the Housing Element policies "would serve to encourage the mission of this plan . . . by placing housing near transit; as well as by encouraging affordable housing, sustainability, and infill development."

According to SFLN, the EIR fails to analyze "the potential that serving regional goals could induce a substantial increase in population and a significant increase in new housing in the City." However, as discussed the Housing Element is not a growth inducing plan. Rather, the Housing Element serves a growth accommodating plan for the inevitable population increase.

SFLN contends the EIR makes only vague references as to how the Housing Element would "serve" regional strategies without explaining the nature of the regional strategies or how serving such strategies could affect the City's land use "pattern" or how they would be carried out. SFLN asserts that by designating certain areas as Priority Development Areas (PDAs), the City was required to re-designate the land uses and the " 'densities/development intensities,' " which included various properties along the eastern and southeastern waterfront. SFLN maintains that the PDA designation represents the impacts of pursuing regional goals that reach far beyond encouraging

---

8       *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, cited by SFLN does not compel a contrary conclusion. That case did not address the issue of whether recirculation was required. Rather, there the issue was a "fragmented" administrative record that was " 'scattered here and there.' " (*Id.* at p. 941.)

growth near transit. The EIR analyzes regional impacts where appropriate. Specifically, the EIR explains that PDAs are "locally-identified, infill development opportunity areas within existing communities . . . . To be eligible to become a PDA, . . . ha[s] to be within an existing community, near existing or planned fixed transit or served by comparable bus service, and planned for more housing." It is estimated that PDAs comprise less than 5 percent of the Bay Area's total land area. While this represents a small portion of the region's land area, the proposed PDAs could accommodate over half of the Bay Area's projected housing growth to 2035, mostly at relatively moderate densities.

SFLN also faults the EIR for failing to "discuss and analyze significant changes in public policy regarding regional sustainability that will significantly [a]ffect the San Francisco environment." Although regional sustainability may have some relevance in determining the significance of a physical change, the purpose of the EIR is to analyze the impacts of the Housing Element, not regional public policy. (See CEQA Guidelines, § 15064, subd. (e) [economic and social changes resulting from project are not treated as significant effects on environment].)

Here, the EIR identified the impacts of its policies encouraging residential development along transit corridors that is consistent with ABAG's regional smart growth strategies. SFLN's disagreement with this analysis is insufficient to establish that the City abused its discretion in determining that the Housing Element is consistent with the Land Use Policy Framework and impacts related to land use conflicts are less than significant. CEQA is not intended to resolve disagreements on public policy issues between a public agency that approves a project and those who oppose it. (E.g., *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1018 [courts "must not overturn an agency's discretionary decisions and substitute their opinions as to what constitutes wise public policy"].)

## D. *Alternatives Analysis*

SFLN contends that the City abused its discretion regarding the EIR's identification and consideration of alternatives. First, SFLN contends that the EIR failed to adequately consider feasible reduced-density alternatives. Second, SFLN argues that

31

the City failed to consider additional mitigation measures to lessen the Housing Element's impact on transit. The City responds that the EIR considered a reasonable range of project alternatives as CEQA requires and that substantial evidence supports its rejection of the proposed alternatives and additional mitigation measures. We consider these arguments in turn.

### 1. Range of Alternatives

"CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts. [Citations.] The CEQA Guidelines state that an EIR must 'describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . .' [Citation.]" (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1163.)

However, an EIR need not consider every conceivable alternative to the project. (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1163.) " 'In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of "feasibility." ' [Citation.] CEQA defines 'feasible' as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' ([]§ 21061.1; see also [CEQA Guidelines,] § 15364.) [¶] 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' ([CEQA Guidelines,] § 15126.6, subd. (a).) The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' (*Id.,* § 15126.6, subd. (f).) An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' (*Id.,* § 15126.6, subd. (f)(3).)" (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1163.)

In addition to analyzing a range of reasonable alternatives, the EIR must also examine a no project alternative. "The purpose of describing and analyzing a no project alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project. . . ." (CEQA Guidelines, § 15126.6, subd. (e)(1).)

An examination of an EIR's alternatives analysis must begin with the project's objectives, for it is these objectives that a proposed alternative must be designed to meet. (*In re Bay-Delta, supra,* 43 Cal.4th at p. 1163; CEQA Guidelines, § 15124, subd. (b).) The EIR identifies the following primary objectives of the proposed Housing Element: "(1) Provide a vision for the City's housing and growth management through 2014; [¶] (2) Maintain the existing housing stock to serve housing needs; [¶] (3) Ensure capacity for the development of new housing to meet the RHNA at all income levels; [¶] (4) Encourage housing development where supported by existing or planned infrastructure, while maintaining existing neighborhood character; [¶] (5) Encourage, develop and maintain programs and policies to meet projected affordable housing needs; [¶] (6) Develop a vision for San Francisco that supports sustainable local, regional and state housing and environmental goals; and [¶] (7) Adopt a housing element that substantially complies with California housing element law as determined by the California Department of Housing and Community Development."

In response to comments about the Draft EIR, the City states that the "EIR analyzes a reasonable range of alternatives in that the decision-makers could adopt the 2004 Housing Element, the 2009 Housing Element, the 2004 Housing Element-Adjudicated, the Intensified Housing Element, or the No Project Alternative." The City maintains that the EIR identifies and describes a range of five different alternatives. In reality, however, the EIR analyzes three alternatives and compares those alternatives to the 2004 and 2009 Housing Elements. Alternative A is continued reliance on the 1990 Residence Element and represents the status quo, also referred to as the No Project Alternative. Alternative B is the 2004 Housing Element—Adjudicated, which is described as the 2004 Housing Element without certain policies stricken by the trial court

33

pending the preparation of the EIR. Alternative C is the 2009 Housing Element-Intensified. Three other alternatives were considered but rejected from further consideration during the scoping phase.

The EIR considers each alternative in depth, and compares each to the 2004 and 2009 Housing Elements. SFLN, however, insists that the EIR analyzes only one alternative that is distinct from the mandatory No Project alternative. According to SFLN, Alternative B is not actually a separate alternative, but just another representation of the status quo or another No Project alternative because the City has enforced the remaining policies of the 2004 Housing Element since this Court's decision on the 2004 Housing Element. As such, SFLN contends that Alternative C is the only true alternative to the project, but it was " 'not designed to reduce significant impacts' " as required by CEQA.

To the extent SFLN would have us conclude, as a matter of law, that consideration in the EIR only of a proposed project and a no project alternative is inadequate, we reject that contention. As explained in *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184 (*Mount Shasta*), in response to a similar claim, **"**there is no rule specifying a particular number of alternatives that must be included. 'CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose.' " (*Mount Shasta, supra,* 210 Cal.App.4th at p. 199.)

Thus, it is incumbent on SFLN as the appellant to show either that in this instance the selected alternatives did not amount to a reasonable range of alternatives or that some particular potentially feasible alternative was excluded. (*Mount Shasta, supra*, 210 Cal.App.4th at p. 199.) SFLN has not met its burden. SFLN has not demonstrated that the range of alternatives in the EIR is manifestly unreasonable or deprives decision-makers and the public of the information they need to evaluate the project and its impacts.

The sole significant impact identified in the EIR is a potential cumulative impact on transit. The EIR anticipates that the California (northwest) and Subway (southwest) transit corridors will operate near Muni's transit capacity in 2025. Also, although the proposed Housing Element would not add any new trips, it contains policies that encourage housing near existing transit lines to accommodate the inevitable population growth. The EIR notes that these policies could potentially increase transit ridership above Muni's capacity utilization standard of 85 percent, and that possible insufficient funding of the San Francisco Metropolitan Transit Agency (SFMTA) may not allow for expanded transit service, thus resulting in a potentially significant impact on the City's transit system.

The Housing Element EIR explains that Alternative A (the No Project alternative) would have no significant impact on transit, but would have a significant impact on historic resources. Alternative B (2004 Housing Element-Adjudicated) is deemed to have a reduced, but still significant, impact on transit, and no significant impact on historic resources. Finally, Alternative C (2009 Housing Element-Intensified) is considered to have an increased impact on transit, compared to either the 2004 Housing Element or the 2009 Housing Element. The EIR identifies Alternative B as the environmentally superior alternative. These alternatives allowed decision makers a meaningful context to weigh the project's objectives against its environmental impacts. This is exactly what an EIR's alternatives analysis is supposed to do.

*Watsonville Pilots Association v. City of Watsonville* (2010) 183 Cal.App.4th 1059 (*Watsonville Pilots*), relied on by SFLN, does not compel a contrary conclusion. There, the EIR for the City of Watsonville 2030 General Plan identified significant impacts due to anticipated growth: increased population, loss of farmland, and increased water usage. (*Id.* at p. 1067.) Watsonville's EIR identified three alternatives (including the required no-project alternative) to the 2030 General Plan, none of which included a reduction in growth. (*Id.* at p. 1088.) Watsonville argued that consideration of the no-project alternative was sufficient consideration of a reduced-growth alternative, even though it met almost none of the project's objectives. The court rejected this argument, noting that

the "purpose of an EIR is *not* to identify alleged alternatives that meet few if any of the project's objectives so that these alleged alternatives may be readily eliminated." (*Id.* at p. 1089.) Instead, the "key to selection of the range of alternatives is to identify alternatives that meet most of the project's objectives but have a reduced level of environmental impacts." (*Ibid.*) Under this standard, the court found that Watsonville's failure to consider a reduced-growth alternative was an abuse of discretion because analysis of this alternative "would have provided the decisionmakers with information about how most of the project's objectives could be satisfied without the level of environmental impacts that would flow from the project." (*Id.* at p. 1090.)

*Watsonville Pilots* is distinguishable because the EIR in this case provided the City's decisionmakers with sufficient information about feasible project alternatives. As an initial matter, as described above, the EIR contains extensive information and analysis regarding the alternatives. The EIR discussed how both Alternative A (No Project/Continuation of 1990 Residence Element) and Alternative B (2004 Housing Element-Adjudicated) would meet most of the Housing Element's objectives, such as ensuring affordable housing, maintaining existing housing stock, and meeting state requirements. Accordingly, this is not a case where the City identified only alternatives that met "few if any of the project's objectives" so that they could be readily eliminated. (*Watsonville Pilots, supra,* 183 Cal.App.4th at p. 1089; see also *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1305 [finding EIR inadequate where it "failed to discuss *any* feasible alternative . . . that could avoid or lessen the significant environmental impact" of the project].)

Equally unpersuasive is SFLN's argument that the EIR erroneously failed to consider its so-called "RHNA-focused reduced-density" alternatives. SFLN proposed an alternative aimed at meeting the RHNA targets for income levels and a "No Additional Rezoning" alternative. In response to comments about the DEIR, the City explained that SFLN's proposed alternatives did not add anything meaningful to the analysis, why they would not reduce the project's potential cumulative transit impacts, and why they were infeasible.

36

Specifically, the City explained that while affordable housing is the focus of the Housing Element, it has conducted environmental review of the potential physical environmental impacts resulting from such housing types. The City has consistently addressed the matter of income levels as a social issue, not an environmental one. As such, analysis of projected income level distribution proposed by SFLN would be speculative and beyond the scope of the EIR. (See CEQA Guidelines, § 15064 (e) [economic and social issues not environmental issues]; see also *Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1661-1662.)

Additionally, substantial evidence supports the EIR's conclusion that the proposed "No Additional Rezoning Alternative" was infeasible. This alternative would discourage additional rezoning of the City's "established" neighborhoods and focus on encouraging development in two of the City's major projects: Candlestick Point-Hunters Point Shipyard and Treasure Island. According to SFLN, these areas would be built from the ground up with new and adequate infrastructure, allowing them to accept a higher rate of density. It is beyond dispute that these major projects exist within the borders of established neighborhoods and cannot be accomplished without rezoning.

Equally without merit is SFLN's contention that the proposed alternatives would avoid or substantially lessen the transit impacts. According to SFLN, the "easiest way to reduce future stress on the City's transit network is to reduce the number of future residents dependent on the transit system by limiting increases in housing density along overcrowded transit lines." First, future residents are inevitable. Second, the potentially significant cumulative transit impact is projected to occur at the California and Subway Muni screenlines as a result of Housing Element Policies that promote increased use of the City's transit network and is not a rezoning issue.

We conclude that the City's choice of alternatives was not manifestly unreasonable. (*Federation of Hillside, supra,* 83 Cal.App.4th at p. 1265.) The City provided a reasonable range of alternatives and the EIR contained sufficient information to inform the decisionmakers and the public of various alternatives to the project. (*Ibid.*) There was no abuse of discretion.

## 2. *Feasibility of Proposed Mitigation Measures*

SFLN further argues that CEQA required the EIR to analyze additional mitigation measures to lessen or avoid the project's impact on transit. Specifically, SFLN proposed mitigation measures that would (1) impose impact fees to fund transit improvements, and (2) limit residential density along transit lines with insufficient capacity.

CEQA requires an EIR to describe feasible mitigation measures that would reduce any of the project's significant environmental impacts. Any mitigation measure must be fully enforceable, and must be consistent with all applicable constitutional requirements. (CEQA Guidelines, §15126.4, subd. (a).) An EIR may properly decline to consider a proposed mitigation measure if substantial evidence supports the EIR's determination that the proposed mitigation measure would not reduce a significant impact, or that the proposed mitigation measure is infeasible, because for example, it is not enforceable or it may violate the constitution. (CEQA Guidelines, §15126.4, subd. (a).)

The Housing Element EIR considered potential mitigation measures and determined that none of them were feasible to eliminate the project's potential significant impact on transit. The only way to eliminate the potential impact on transit would be to increase the number of transit vehicles or reduce transit travel time. Increased SFMTA funding is uncertain, and cannot be guaranteed. The EIR recommends approval of all transit efficiency measures under consideration, but it is uncertain to what degree those measures would decrease transit travel time. For these reasons, the EIR deems these potential mitigation measures infeasible under CEQA.

The EIR addresses SFLN's proposed mitigation measures in its Responses to Comments. Specifically, the City noted that it already implements a transit impact development fee for all commercial uses, and those fees are paid to SFMTA to improve local transit services. SFLN's suggestion is nothing more than what the EIR already concludes could mitigate the transit impact, but was infeasible because it cannot be guaranteed. Similarly, SFLN's suggestion to limit residential density is simply a permutation of Alternative A, the "no project" alternative. Because substantial evidence

supports the EIR's assessment of SFLN's proposed mitigation measures, CEQA does not require any further evaluation of them.

### III. DISPOSITION

The judgment is affirmed.  Respondent to recover its costs on appeal.

_____
REARDON, J.


We concur:


_____
STREETER, ACTING P. J.


_____
SMITH, J.*


*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                       City and County of San Francisco Superior Court


Trial Judge:                      Hon. Terri L. Jackson


Counsel for Plaintiff and       Kathryn R. Devincenzi
Appellant:

                                Amy Minteer, Esq.
                                Chaten-Brown & Carstens, LLP


Counsel for Defendant and     Dennis J. Herrera
Respondent:                   City Attorney
                                Audrey Williams Pearson
                                Deputy City Attorney