Filed 2/2/26

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE COMMITTEE FOR TIBURON LLC,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TOWN OF TIBURON,<br><br>    Defendant and Appellant;<br><br>SIERRA PINES GROUP, LLC,<br><br>    Real Party in Interest. | A171983<br><br>(Marin County<br>Super. Ct. No. CV0000086) |

Pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.),[1] the Town of Tiburon (Town) prepared and certified a program-level Environmental Impact Report (EIR) for its general plan update.  Thereafter, The Committee for Tiburon LLC (Committee) filed a petition for a writ of mandate, challenging the adequacy of the EIR based

---

*     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts D and E of the Discussion.

[1]     All statutory references are to the Public Resources Code, unless otherwise indicated.  We will cite and refer to CEQA's implementing regulations, codified at title 14, division 6, chapter 3 of the California Code of Regulations, as the "Guidelines."  The CEQA Guidelines are given "great weight in interpreting CEQA, except where they are clearly unauthorized or erroneous." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4)

1

on its failure to analyze the specific environmental impacts of developing housing on "Site H," one of 17 sites identified in the general plan's housing element that would accommodate the Town's projected regional housing needs of 639 units plus a buffer of 277 units (916 total units).  Even though the Town is not legally obligated to build housing on any of the 17 sites, and even though no housing project has been proposed for Site H, the trial court agreed with the Committee and granted its petition.

The question presented is this:  If a local government is updating its general plan and housing element site inventory, and no specific housing project has been proposed for a listed site, must the EIR for the general plan analyze site-specific environmental impacts of potential development for that site?  This is a weighty issue, as it affects the CEQA responsibilities of local governments throughout the state.  Although the Town is a relatively small local agency whose housing element identifies only 17 sites, requiring site-specific analyses could increase the EIR obligations exponentially for larger local agencies, some of which list sites numbering in the hundreds.  (See, e.g., Alameda County 2023-2031 Housing Element https://www.acgov.org/cda/planning/housing-element/sites-inventory.htm [identifying 523 different parcels to meet its projected regional housing needs of 4,711 units] as of February 2, 2026.)

In the published portion of this opinion, we draw from the relevant statutory, regulatory, and decisional authorities to conclude that a program EIR for a local agency's general plan need not include a site-specific environmental analysis of a site identified in its housing element where, as here, no housing project has been proposed for the site.  When a housing project has not even been proposed, the lack of project-specific details precludes an informed review of environmental impacts and mitigation

2

measures, and deferral of such a review to a site-specific, project-level EIR analysis is appropriate. Accordingly, we hold the trial court erred in granting the Committee's petition based on the failure of the Town's EIR to analyze site-specific impacts of developing housing on Site H.

In the unpublished portion of this opinion, we explain our reasons for remanding the matter to the trial court with instructions to consider the applicability of recent CEQA amendments to the Town's decision to rezone Site H and to consider the Committee's claim that the Town's general plan is not internally consistent and compatible.

## OVERVIEW AND FACTUAL BACKGROUND

### *A. General Plan and Housing Element Requirements*

The Planning and Zoning Law (Gov. Code, § 65000 et seq.) requires local governments to "adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300.) The general plan serves to guide all future development and is the basis for a local government's land use regulations. (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 609 (*San Franciscans*).)

Each general plan must include eight mandatory elements: land use, circulation, housing, conservation, open space, noise, safety, and environmental justice. (Gov. Code, § 65302, subds. (a)–(g).) The housing element requirement relates to the Housing Element Law (Gov. Code, § 65580 et seq.), which reflects the Legislature's determinations that housing availability is of " 'vital statewide importance' " and that the " 'attainment of decent housing and a suitable living environment [is] a priority of the highest order.' " (*San Franciscans*, *supra*, 26 Cal.App.5th at p. 609; Gov. Code,

3

§ 65302, subd. (c).)  One purpose of the Housing Element Law is to assure that cities " 'recognize their responsibilities in contributing to the attainment of the state housing goal,' including 'housing affordable to low-and-moderate-income households.' " (*Ibid.*)  As part of the law's regional housing needs assessment procedure, each local government is assigned a share of the existing and projected regional housing needs, i.e., its regional housing needs assessment ("RHNA").  (*Id.* at p. 610.)

As relevant here, the housing element of a local government must include " '[a]n assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs,' including an inventory of land suitable for residential development." (*San Franciscans*, *supra*, 26 Cal.App.5th at pp. 609–610; Gov. Code, § 65583.)  The sites listed in this inventory must have a realistic and demonstrated potential for redevelopment during the planning period, and an analysis of the relationship between zoning, public facilities, and the services for these sites must be included.  (Gov. Code, § 65583, subd. (a)(3).)  Among other things, the required information must include the size, general plan designation, and zoning of each property, a map showing the property's location, a general description of any environmental constraints to the development of housing, and a description of existing or planned utilities, including availability of and access to distribution facilities.  (Gov. Code, § 65583.2, subd. (b)(2), (4), (5), (7).)  The general description of environmental constraints, however, need not be identified on a site-specific basis.  (Gov. Code, § 65583.2, subd. (b)(4).)

After a local government has assessed its housing needs and compiled its site inventory, it must prepare programs and policies to effectuate its needs.  (Gov. Code, § 65583, subd. (c).)  If the available sites do not accommodate the local government's RHNA for each income level, the

4

adopted program must identify actions that will accommodate those needs, including rezoning.  (*Id*., § 65583, subd. (c)(1)(A).)

Generally, a local government must update its housing element at least every eight years to identify specific sites that are sufficient to accommodate their RHNAs.  (Gov. Code, §§ 65588, subd. (e)(3)(A)(i), 65583.2, subd. (a).)  Housing elements are subject to review by the California Department of Housing and Community Development (HCD), which oversees local land use planning, as well as the review and certification of all housing elements for substantial compliance under the Housing Element Law.  (See generally Gov. Code, § 65585.)

### B. The Town's General Plan Update

In 2020, the Town began the process of preparing "the General Plan 2040," a comprehensive update to its existing general plan which was last prepared in 2005 (with updates to the circulation element in 2016 and the 2014 Housing Element).  As part of the process, the Town conducted extensive community outreach "to understand key issues and opportunities to be explored" in the general plan update.  The General Plan 2040 was "intended to be an expression of the community's vision for the Town and Planning Area and constitutes the policy and regulatory framework by which future development projects will be reviewed and public improvements will be implemented."

The General Plan 2040 is organized into the following 11 chapters: Introduction; Land Use; Downtown; Housing; Diversity, Equity + Inclusion; Mobility; Noise; Sustainability; Conservation; Open Space, Parks + Recreation; and Safety + Resilience.  "Each chapter describes existing conditions and context for the related topic area, followed by goals, policies, and programs to guide the Town's management and development."  As

pertinent here, the land use chapter "describes land use in Tiburon and how and where new development will occur," while the housing chapter "describes the need for housing, especially affordable to lower and moderate-income households, and sites available for housing."

The housing chapter discusses the Town's "2023-2031 Housing Element,"[2] which it incorporates as an appendix. For this eight-year housing element cycle, the Town's share of the regional housing needs is a total of 639 housing units, which represents 4.4 percent of the 14,405 units allocated to Marin County as a whole.

The housing chapter then explains: "Most of the sites within residential zones in the Town are built out or are not viable for high-density development due to environmental or topographic constraints and therefore offer very limited new housing opportunities. Where there are sites that can accommodate higher residential density, residents have expressed concerns about impacts that may result from the addition of a substantial number of new housing units . . . . Nonetheless, the Town recognizes that it must provide opportunities to meet its RHNA. To achieve this goal, the Town increased allowable residential densities on certain housing opportunity sites and identified mixed-use zones in the Downtown."

As the 2023-2031 Housing Element noted, the Town "must provide opportunities for high density residential development outside of traditional residential zones. To achieve this goal and provide the density needed to

---

[2]     The Town's "2023-2031 Housing Element" is a separate document requiring HCD review and approval. (See part A, *ante*.) In this case, the housing element was still in draft form when the EIR was certified in May 2023. As will be explained, HCD called for additional review and revision of the Town's 2023-2031 Housing Element, which HCD ultimately approved in October 2023.

meet the RHNA within the planning period, most of the multifamily sites are in mixed use zones that allow housing." The housing element then identified 17 vacant or underutilized sites, which must be rezoned, to meet the Town's RHNA. Consistent with the 2023-2031 Housing Element, the General Plan 2040 included implementation programs to rezone all 17 sites to accommodate the Town's RHNA.

The controversy in this case centers around 4576 Paradise Drive, labeled as Site H in the 2023-2031 Housing Element attached to the General Plan 2040.[3] Site H is over nine acres in size and contains two residential units. Site H was previously zoned for "residential planned development," allowing a maximum of seven units on the site. The 2023-2031 Housing Element proposed changing Site H's zoning designation to "very high density residential," with a realistic development capacity of 93 units. This change would allow single-family and multi-family residential use with a minimum density up to 10 dwelling units per acre. Additional compatible uses may be permitted under this designation.

### C. Environmental Review of the General Plan 2040

Upon determining that the General Plan 2040 was a project under CEQA, the Town prepared an EIR to "evaluate the potential environmental impacts" associated with its implementation. The Town structured its Draft EIR as a program EIR to provide a "program-level analysis" to consider "the broad environmental effects" of the general plan update. In the words of the Draft EIR, it "analyz[ed] potential impacts to the environment associated with implementation and buildout of the General Plan 2040, which included future development projects, infrastructure improvements, and the implementation of policies and actions included in the General Plan 2040."

---

[3]     Site H is owned by real party in interest, Sierra Pines Group, LLC.

7

As required by CEQA, the Draft EIR evaluated "the direct, indirect, and cumulative impacts" of the General Plan 2040 in the environmental topic areas of aesthetics, air quality, biological resources, cultural and tribal cultural resources, energy, geology and soils, greenhouse gases, climate change, and energy, hazards and hazardous materials, hydrology and water quality, land use and planning, noise, population and housing, public services and recreation, circulation, utilities and services systems, and wildfire. (§§ 21063, 21083, subd. (b); Guidelines, §§ 15126.2, 15382.)  Each section contains a description of the existing environment and regulatory environment as relevant to the topic area, identifies the thresholds of significance, describes the impacts and cumulative impacts "from construction, operation, and maintenance activities related to future development that could occur under the General Plan 2040" on the topic area, and identifies applicable mitigation measures.  (Guidelines, §§ 15125, 15126.2, 15126.4, 15130.)

Describing the updating of the housing element as an "integral part" of the General Plan 2040, the Draft EIR's analysis assumed a full buildout of each of the 17 sites identified in the 2023-2031 Housing Element "based on the maximum permitted density for the General Plan 2040 land use designation."  Site H, in particular, was assumed to have a residential capacity of up to 118 net units based on its maximum permitted density. Additionally, the Draft EIR assumed more residential units "than the minimum number of units required by the RHNA to allow for a buffer," as mandated by HCD.  But the Draft EIR explained that, as a program-level general plan EIR, it "does not evaluate individual projects that may be allowed under the General Plan 2040 at a site-specific level.  Because the General Plan 2040 establishes policies, goals and guidelines, and describes

8

potential development that may or may not be built on any particular site, environmental review will necessarily be general. . . .  [¶] The General Plan 2040's inventory of residential sites fulfills a State-mandated requirement to ensure that the Town's RHNA can be accommodated.  In other words, the General Plan 2040 identifies enough land designated at appropriate densities to accommodate the RHNA allocation and ensures the Town will rezone its housing sites consistent with the General Plan 2040."

In summary, the Draft EIR did not conduct a specific environmental review of each individual site listed in the housing element inventory. Instead, it considered the overall addition of 916 units throughout the Town, using the anticipated number of additional people and residences to project the impacts that may arise from such a general increase in population and housing within each of the EIR topic areas.  In this way, the Draft EIR provided a Town-wide review of the broad environmental impacts of the changes made to the general plan, based on the overall increase of the updated regional housing needs anticipated through the housing element.

The Draft EIR made clear, however, that "[f]uture development proposals will be reviewed to determine whether their impacts fall within the scope of analysis in this Draft EIR or if additional site-specific environmental review will be required because new potentially significant impacts would result.  As provided for in CEQA Guidelines Sections 15152 and 15385, any subsequent environmental document that might be required for a development project could 'tier' from this Draft EIR and focus its analysis on any new or more severe significant impacts."  The Draft EIR nonetheless indicated that if a future project requires "no discretionary action," or no review and approval by the Planning Commission, Town Council, or other

9

agencies, then such project would be "ministerial" and presumably approved without further EIR review.

As CEQA also mandates, the Draft EIR considered three project alternatives: a no project alternative, a village centers alternative, and a downtown density alternative. (Guidelines, § 15126.6.) The village centers alternative would focus more on new development of multifamily housing near shopping areas within the Town and reduce the development potential of Site H to a maximum of 49 units. The downtown density alternative would increase the development potential in the downtown area and reduce the development potential of Site H to the units allowed under the existing 2020 General Plan.

The Draft EIR explained the general plan update "has been developed to be largely self-mitigating in that the goals, policies, and programs in the General Plan 2040 recognize the importance of natural environment and are designed to protect the environment and environmental resources. In certain instances, mitigation is included to reinforce and enhance the protections identified in the policies and programs." But after considering the self-mitigating goals and policies and implementation of the proposed mitigation measures, the Draft EIR ultimately concluded the General Plan 2040 would cause significant and unavoidable impacts to air quality, greenhouse gas emissions, transportation, and utilities and service systems. At the same time, the Draft EIR determined the development facilitated by the general plan "would *not* induce" or cumulatively induce "substantial unplanned population growth either directly or indirectly" and "would *not* displace a substantial number of people requiring the construction of new housing." (Italics added.)

10

During the review process, the Town received various comments on the Draft EIR, including many regarding the proposed increased residential density of Site H.  Among the concerns raised were the "narrow and curvy nature of Paradise Drive"; ingress and egress concerns; bicycle use of Paradise Drive; increased traffic effects and "failure to consider the need to widen Paradise Drive"; construction-related effects and onsite slopes; "emergency safety concerns"; "sewage system problems"; "potential loss of onsite trees"; "loss of privacy"; and "general concern with the number of units anticipated for the site."

The Town's Final EIR provided responses to all the comments received.  In answer to the concerns regarding Site H, the document explained:  "Due to the programmatic nature of the Draft EIR, environmental analysis of the carrying capacity of the site was analyzed as part of potential overall implementation of the General Plan 2040; however, no site-specific analysis was conducted for development of [Site H] or any other site identified in the General Plan 2040 for increased residential density . . . , and it would be premature and overly speculative to attempt to evaluate the potential effects raised by the comments at this time.  As discussed . . . in the Draft EIR, any development application submitted for the property will undergo site-specific CEQA review to the extent deemed necessary."  The EIR revised the Draft EIR to "update, refine, amplify, and correct the information and analyses" either in response to comments or as initiated by Town staff, but determined the changes did not require recirculation of the Draft EIR.

On May 22, 2023, the Town passed a resolution certifying the EIR, which included its adoption of CEQA findings of fact for the General Plan 2040, a Statement of Overriding Considerations, and a Mitigation Monitoring and Reporting Program.  The same day, the Town adopted the General Plan

11

2040, with its inclusion of the 2023-2031 Housing Element, by separate resolution.

After adopting the General Plan 2040, the Town received written comments from HCD staff requesting changes to the adopted 2023-2031 Housing Element for it to be in substantial compliance with the Housing Element Law.  As relevant here, the Town revised the housing element to address third party comments received by HCD regarding the potential constraints that may impede the development of Site H, and to update the program rezoning Site H to include development standards to accommodate the designated housing capacity despite the known site constraints.  The Town provided additional analysis in the housing element of the site-specific constraints of development on Site H to demonstrate that it was suitable for redevelopment at the specified density.  Additionally, in response to traffic and safety concerns, the Town prepared a "Transportation Memo" confirming that additional vehicles and people resulting from Site H development were already accounted for in the overall traffic modeling for the General Plan 2040 and included in the EIR.  The Town also prepared the "Site H Conditions Report" to document and analyze existing conditions on Site H.

On September 20, 2023, the Town passed a resolution adopting amendments to the 2023-2031 Housing Element of the General Plan 2040. The Town found that the information addressed by the amendments had been analyzed in the General Plan 2040 EIR and that there were no new significant impacts or other triggers requiring additional CEQA review.

On December 6, 2023, the Town passed an ordinance amending provisions of the zoning chapter of the Tiburon Municipal Code.  The ordinance noted that HCD found the 2023-2031 Housing Element to be in substantial compliance with the Housing Element Law on October 18, 2023,

and that "amendments to the Zoning Ordinance and Zoning Map are necessary to permit housing at the densities specified within the Housing Element, including changes to the base zoning of parcels." The ordinance also noted that objective development and design standards and associated rezonings for commercial mixed-use development in the Downtown area were previously adopted on June 21, 2023. Consistent with the 2023-2031 Housing Element, the Town established a new zoning district, rezoned Site H, and adopted objective development and design standards for new multifamily housing developments, including for hillside sites such as Site H. The Town found that the EIR for the General Plan 2040 analyzed the impacts of the proposed amendments to the zoning code and zoning map, and that no supplemental or subsequent EIR was required.

### D. The Committee's Challenge to the EIR

Meanwhile, back on June 23, 2023, the Committee filed a petition for writ of mandamus seeking to set aside the Town's general plan and housing element to the extent they designate Site H for very high density development, as well as the Town's decision to rezone Site H.[4] The petition's first cause of action alleged the Town violated CEQA by failing to analyze or acknowledge the significant impacts on aesthetics, biological resources, hydrology and water quality, land use, and transportation resulting from changing the zoning designation of Site H from residential planned development to very high density residential. The second cause of action alleged the Town violated state planning and zoning laws because the General Plan 2040 is not internally consistent and compatible. The petition

---

[4] The Committee initially filed its petition under the name "The Committee to Preserve the Paradise Cove Salt Marsh, Tidelands, and Neighborhood Safety LLC." The Committee subsequently changed its name to the "Committee for Tiburon LLC."

13

further alleged that Site H's designation as very high density development will cause significant environmental impacts that are inconsistent and incompatible with the general plan's conservation, mobility, and bicycle policies, as well as the bicycle and pedestrian plan.

On September 28, 2023, the Committee filed a first amended petition with new allegations that the Town adopted general plan amendments contemplating that culverts and clustered development would be used on Site H without additional environmental review. Then, on December 15, 2023, the Committee filed a second amended petition further alleging the Town's amendment of the zoning code to rezone Site H as multifamily residential prohibits open space use and mandates a minimum of 10 housing units per acre. According to the petition, such rezoning effectively mandates the conversion of Site H from open space to dense residential development without additional environmental review.

The trial court granted the Committee's petition, finding both that the EIR failed to include site-specific impacts of developing housing on Site H and that those impacts were reasonably foreseeable and feasible to analyze in the EIR. The Town appealed.[5]

## DISCUSSION

### A. CEQA Standard of Review

In a CEQA case, we review " 'the agency's action, not the trial court's decision.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.) "The ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its

---

[5] HCD, jointly with the Attorney General of California, and the California League of Cities, jointly with the California State Association of Counties, filed amicus curiae briefs in support of the Town's appeal.

preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citations.] The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. [Citations.] Thus, to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*Sierra Club*).)

Here, a program EIR was prepared for a comprehensive update to an existing general plan, in which the requisite housing element included an inventory of housing sites that would allow the local government to meet its RHNA obligations consistent with the Housing Element Law. We are asked to consider whether CEQA requires that a program EIR for a general plan include site-specific environmental analyses of the housing sites listed in the inventory. As this inquiry involves a question of law, we apply independent review.

### B. Program EIRs

CEQA and its implementing regulations "embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to

15

be feasible.  [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' " (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*), quoting Guidelines, § 15002.)

As the California Supreme Court explains, " '[t]he foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citation.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' [Citations.]  The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.] 'Because the EIR must be certified or rejected by public officials, it is a document of accountability.  If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' " (*Sierra Club*, *supra*, 6 Cal.5th at pp. 511–512.)

*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143 (*Bay-Delta*) provides a helpful discussion of "program" and "project" EIRs and their differences.  "A program EIR . . . is 'an EIR which may be prepared on a series of actions that can be characterized as one large project' and are related in specified ways. ([Guidelines], § 15168, subd. (a).)  An advantage of using a program EIR is that it can '[a]llow the lead agency to consider broad policy alternatives and

16

program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts.' (*Id.*, § 15168, subd. (b)(4).) Thus, a *program* EIR is distinct from a *project* EIR, which is prepared for a specific project and must examine in detail site-specific considerations. (*Id.*, § 15161.)" (*Bay-Delta*, at p. 1169; see *Olen Properties Corp. v. City of Newport Beach* (2023) 93 Cal.App.5th 270, 279, fn. 5 ["a program EIR is an EIR about a broad program or plan, as opposed to a specific project"].)

As *Bay-Delta* explains, "[p]rogram EIR's are commonly used in conjunction with the process of tiering. [Citation.] Tiering is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . .' ([Guidelines], § 15385.) Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' (Pub. Resources Code, § 21093, subd. (a); see also [Guidelines], § 15385, subd. (b).)

"In addressing the appropriate amount of detail required at different stages in the tiering process, the CEQA Guidelines state that '[w]here a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof . . . , the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of a more limited geographic scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand.' ([Guidelines], § 15152, subd. (c).) This court has explained that '[t]iering is properly used to

17

defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases.'" (*Bay-Delta*, *supra*, 43 Cal.4th at pp. 1169–1170.)

In *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, the Court of Appeal further explained: "Designating an EIR as a program EIR . . . does not by itself decrease the level of analysis otherwise required in the EIR. 'All EIR's must cover the same general content. (Guidelines, §§ 15120–15132.) The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR.'" (*Friends of Mammoth*, *supra*, 82 Cal.App.4th at pp. 533–534.) This means the sufficiency of a program EIR must be reviewed in light of what is reasonably feasible, given the nature and scope of the project. (*Center for Biological Diversity v. California Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 233; see *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 234.)

In this regard, the Guidelines provide that, in general, "[a]n EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible . . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.) Similarly, the "degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity

18

which is described in the EIR.  [¶] . . . .  [¶] (b) An EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." (*Id.*, § 15146.)

Nonetheless, " '[t]he fact that precision may not be possible . . . does not mean that no analysis is required.  "Drafting an EIR . . . involves some degree of forecasting.  While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.)' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 938.)  All the same, "[a]n EIR is not required to engage in speculative analysis," and this is a "core principle" that is "well established in the Guidelines and case law." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1060–1061; Guidelines, § 15145.)  Thus, "[w]hile a lead agency must use its 'best efforts' to evaluate environmental effects, including the use of reasonable forecasting, 'foreseeing the unforeseeable' is not required, nor is predicting the unpredictable or quantifying the unquantifiable.  [Citations.] [¶] This rule rests on both economic and practical considerations.  It has long been recognized that premature attempts to evaluate effects that are uncertain to occur or whose severity cannot reliably be measured is 'a needlessly wasteful drain of the public fisc.' " (*Ibid.*)

Importantly, CEQA review is "not triggered where there is not yet an identifiable impact as until that point, the review process [cannot] be meaningful in the sense that it allows consideration of alternatives that could

19

mitigate the impact." (*Santa Rita Union School Dist. v. City of Salinas* (2023) 94 Cal.App.5th 298, 332.)

### C. Analysis

As indicated, CEQA law clearly anticipates a public agency's use of a program EIR when considering large projects such as a general plan update, as the Town did here. (E.g., Guidelines, § 15385.) As the Town correctly posits, the issue ripe for decision at this level of environmental review was approval of the general plan with its updated housing element and anticipated zoning changes. Accordingly, the EIR correctly focused on the overall addition of 916 units throughout the Town, using the anticipated number of additional people and residences to forecast the secondary effects that can be expected to follow from such a general increase in population and housing within the EIR topic areas. In doing so, the EIR properly analyzed the environmental impacts in a broad manner, reviewing the overall increase in housing needs anticipated through the general plan's housing element, without considering any site-specific environmental effects of housing projects that have not yet been proposed. But as the EIR also recognized, if and when a specific housing project is proposed—whether on Site H or any of the other 16 sites listed in the inventory—then the development of detailed, site-specific information will in fact be feasible. (See Guidelines, § 15152, subd. (c).)

In advocating the current necessity of a site-specific environmental analysis of Site H, the Committee relies on *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordoba* (2007) 40 Cal.4th 412 (*Vineyard*). That reliance is misplaced.

*Vineyard* involved an EIR for a community plan involving "a large, mixed-use development project" on more than 6,000 rural acres that, fully

20

built, would include "more than 22,000 residential units, housing as many as 60,000 people, together with schools and parks, as well as office and commercial uses occupying 480 acres of land." (*Vineyard, supra*, 40 Cal.4th at pp. 421–422.) The EIR also addressed "a specific plan for the first portion of that development." (*Id.* at p. 421.) Though *Vineyard* concluded the EIR adequately informed decision makers and the public of the county's plan for near-term provision of water to the development, it held the EIR inadequate for its failure to address the impacts of supplying water in the long term. (*Ibid.*) In the court's words, "an adequate environmental impact analysis for a large project, to be built and occupied over a number of years, cannot be limited to the water supply for the first stage or the first few years," despite CEQA's tiering provisions. (*Id.* at p. 431.)

As *Vineyard* explained, "[t]iering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases. For example, to evaluate or formulate mitigation for 'site specific effects such as aesthetics or parking' [citation] may be impractical when an entire large project is first approved; under some circumstances analysis of such impacts might be deferred to a later tier EIR. But the future water sources for a large land use project and the impacts of exploiting those sources are not the type of information that can be deferred for future analysis. *An EIR evaluating a planned land use project must assume that all phases of the project will eventually be built* and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project." (*Vineyard, supra*, 40 Cal.4th at p. 431, italics added.) It is the italicized language in the foregoing passage that the Committee cites in asserting the inadequacy of the

21

Town's EIR. Given the context in which the italicized language appears, as well as the obvious differences between the project addressed in the *Vineyard* EIR and the EIR for the General Plan 2040, we are not convinced.

In contrast to the situation in *Vineyard*, the EIR here was evaluating a large-scale planning document, not a concrete development project. The EIR did not need to assume that all "phases of the project will eventually be built" because the identified housing sites are not phases of one large development, but components of a planning document being used to satisfy the Town's legal obligation under the Housing Element Law. Indeed, it is undisputed that the Housing Element Law requires only that local governments identify sufficient sites with a realistic development potential and make such sites available to accommodate their RHNA. (See generally Gov. Code, § 65580 et seq.) The law does not require the Town to build housing, and there is no guarantee that every site identified in the 2023-2031 Housing Element will be developed. Where, as here, a specific housing project has not been proposed and "the absence of project-specific details" precludes a detailed analysis of impacts and mitigation measures at the program-level stage, a site-specific EIR analysis is properly deferred to the project level. (See *Western States Petroleum Assn. v. State Air Resources Bd.* (2025) 108 Cal.App.5th 938, 979 [collecting cases].)

We find the instant situation more analogous to the circumstances in *City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833 (*Hayward*). There, the university trustees created a program EIR for approval of the university's master plan. Though the subject EIR analyzed the impacts of increased population on traffic in the surrounding areas, including the primary intersection in that area, the trustees "utilized a tiering approach for analysis of future projects not yet in

22

development." (*Id.* at p. 850.)  In upholding this approach, *Hayward* determined the EIR's traffic analysis was "important to avoid piecemeal consideration of cumulative traffic impacts" and found its deferral of "[s]ite-specific impacts to the smaller residential streets in the neighborhood and related mitigation measures . . . were properly deferred until the project is planned and a project EIR is prepared." (*Ibid.*)

The *Hayward* court elaborated:  "Although locating housing at this site may cause impacts to the neighborhood, there are many variables to be considered in connection with such a project, such as the location of entrances and placement of parking spaces, that will affect where in the surrounding neighborhood the impacts will be most felt and the measures that can mitigate those impacts.  These specifics cannot meaningfully be evaluated at this point.  There is no suggestion that deferring consideration of site-specific impacts will disguise cumulative impacts or preclude proper consideration of mitigation measures if and when construction of such housing is proposed." (*Hayward*, *supra*, 242 Cal.App.4th at p. 850.)

As in *Hayward*, the Town's use of a program EIR and its level of analysis are appropriate for the General Plan 2040 because—at the time of the Town's EIR analysis—the Town had made no commitment to a housing project at any of the 17 sites identified in the housing element.  In identifying Site H, along with the other 16 undeveloped and underdeveloped sites, the Town sought to satisfy its statutory obligation to "have land designated and zoned to accommodate" the Town's RHNA.  But as the EIR explained, the Town "is not required to ensure that adequate development to accommodate the RHNA occurs."  And absent a specific project proposal for Site H, requiring environmental review of site-specific resources under CEQA is premature and unlikely to yield any meaningful analysis.  Indeed, two of the

23

basic purposes of CEQA are to identify ways in which environmental damage can be avoided or reduced and to prevent significant, avoidable damage to the environment by analyzing alternatives and mitigation measures. (*Tomlinson*, *supra*, 54 Cal.4th at pp. 285–286.) Without a site-specific proposal for development, neither purpose can be served because potential alternatives and mitigation measures designed to avoid or reduce environmental damage to site-specific resources cannot be analyzed.

In resisting this conclusion, the Committee contends the Town had enough information about site-specific environmental impacts that were reasonably likely from the proposed very high density development of Site H, "regardless of whatever specific construction plan might ultimately be submitted." On this score, the Committee highlights that a few months after the Town certified the EIR, the Town submitted two reports regarding Site H—namely, the Transportation Memo and Site H Conditions Report—to HCD as part of the review and approval process for the 2023-2031 Housing Element. Pointing out that the site conditions report provided an assessment of Site H's wetlands, watershed, streams, and drainage channels and identified various potential means for developing the proposed number of housing units on the site to overcome the site's physical limitations and regulatory constraints, the Committee suggests these reports show the feasibility of a site-specific analysis of Site H for inclusion in the EIR. We are not convinced.

Though the Town's letter reports supported the inclusion of Site H in the site inventory for the requisite housing element of the general plan update, they fall short of demonstrating the necessity and feasibility of additional site-specific CEQA review at this time. In particular, they do not

24

evaluate the environmental effects or potential mitigation measures associated with any proposed project.

The Committee also asserts the Town was aware of potential environmental issues with developing Site H before the program EIR was certified. While that appears correct, the Town properly analyzed the potential environmental impacts of the General Plan 2040 as a whole. And as previously indicated, the Housing Element Law does not require the Town to develop any specific housing project—either on Site H or on any of the other 16 sites identified by the Town. Without a proposed project that identifies critical factors such as the amount and configuration of the proposed housing, the planned means of access to the site, and the availability of alternatives, the Town can only speculate as to the severity of any particular environmental impacts or the effectiveness of potential mitigation measures that would minimize those impacts at the site. Because it is entirely speculative at this point whether a housing project will even be proposed for Site H, a meaningful environmental analysis focusing on Site H is not feasible.

To reiterate, the issue facing the Town was whether to approve the General Plan 2040 with its updated housing element and anticipated rezoning. Under the Housing Element Law, the Town was obligated to identify sites with a realistic and demonstrated potential for redevelopment and to identify actions, such as rezoning, to accommodate its RHNA. The Town did so. It made the choice to include undeveloped and underdeveloped sites, including Site H, as potential locations for future housing projects. This clearly fell within the Town's policy-making authority to decide how and where to make additional space available for future housing. (Gov. Code, § 65301.5 [adoption of general plan or any element thereof is a legislative

25

act].)  The EIR therefore focused, quite properly, on the environmental impacts of an additional 916 housing units within the Town in a broad and cumulative manner.

Moreover, the Committee offers no basis for concluding that deferral of a site-specific environmental impacts analysis for Site H, or any other site included in the site inventory, prevents "adequate identification of significant effects of the planning approval at hand." (Guidelines, § 15152, subd. (c).) The Committee makes no claim that the EIR's analyses of the environmental impacts of the General Plan 2040 were otherwise inadequate.  Nor does it challenge the EIR's analysis of alternatives to the general plan update.  On this record, the Committee fails to establish that the lack of site-specific analysis demonstrated the program EIR's inadequacy under CEQA.

Finally, the Committee speculates that if no site-specific environmental review for Site H is included in this EIR, then no such analysis will ever be conducted.[6]  This argument appears contrary to the weight of legal authority and the dictates of CEQA.

"Program EIRs are routinely used 'to avoid preparing multiple EIRs for a series of actions.' [Citation.]  When used for this purpose, 'the public agency must examine [subsequent] site-specific program activities "in the light of the program EIR to determine whether an additional environmental

---

[6]     If a housing project were proposed for Site H, the Town would have to conduct a preliminary review to determine whether the project is statutorily or otherwise exempt from compliance with CEQA.  (*Tomlinson, supra,* 54 Cal.4th at p. 286.)  As the Attorney General and HCD observe, the possibility that a future housing project may qualify for a CEQA exemption does not, by itself, make site-specific impacts more feasible to analyze at the general plan and housing element stage.  In any event, because neither side argues the applicability of an exemption for a project on Site H, we assume, for the purposes of this discussion, that none is implicated.

document must be prepared." ' " (*IBC Business Owners for Sensible Development v. City of Irvine* (2023) 88 Cal.App.5th 100, 118–119 (*IBC*).) "[P]reparation of a site-specific environmental document through a public process is only required if the agency discovers new impacts that were unaddressed in the program EIR." (*Ibid.*)

"When determining whether later activities are within the scope of a *program* EIR, the Guidelines adopt an approach used to determine whether a *project* EIR requires a subsequent EIR." (*IBC, supra*, 88 Cal.App.5th at p. 119.) In the latter situation, "once a project EIR has been certified, a subsequent EIR is not required unless there are substantial changes to the project, substantial changes to the circumstances surrounding the project, or new material information becomes available." (*Ibid.*, citing Guidelines, § 15162, subd. (a).) "The Guidelines use the same criteria to determine whether a later site-specific activity is consistent with a program EIR." (*IBC*, at p. 119.) Tiered review is necessary "if the later site-specific activity would have significant environmental effects that were not examined in the program EIR. [Citations.] If the activity has such unexamined effects, 'a new initial study [needs] to be prepared leading to either an EIR or a negative declaration. That later analysis may tier from the program EIR . . . .' (Guidelines, § 15168, subd. (c)(1).)" (*IBC*, at p. 120.[7])

_____

7       Guidelines section 15168, subdivision (c)(2), provides in relevant part: "Whether a later activity is within the scope of a program EIR is a factual question that the lead agency determines based on substantial evidence in the record. Factors that an agency may consider in making that determination include, but are not limited to, consistency of the later activity with the type of allowable land use, overall planned density and building intensity, geographic area analyzed for environmental impacts, and covered infrastructure, as described in the program EIR."

In light of these authorities, the Town's recognition that site-specific review for Site H must await the proposal of a housing project, and the detailed public comments regarding potential impacts that are not specifically analyzed in the program EIR, it appears likely that a project EIR will be required for any housing project proposed for Site H.  (See Guidelines, § 15168, subd. (c)(2).)[8]

### D. Rezoning

The Committee also argues the rezoning of Site H was its own project under CEQA, such that site-specific issues on Site H were ripe for review. Even if the rezoning of Site H could be considered a separate project, the Committee has not established that a separate site-specific environmental review is presently necessary.

As the Attorney General and HCD point out, the Legislature recently amended CEQA to expressly exempt "rezoning that implements the schedule of actions contained in an approved housing element pursuant to subdivision (c) of Section 65583 of the Government Code," subject to certain exceptions. (§ 21080.085, added by Stats. 2025, ch. 24, § 6 (Sen. Bill No. 131), eff. June 30, 2025.)  At oral argument, the Committee conceded the California Supreme Court's decision in *Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43 supports the application of that amendment in this case.  (See *Make UC a Good Neighbor*, at pp. 55–56, 65 [in mandamus proceedings, "a reviewing court applies the law that is current at the time of judgment in the reviewing court"; statute enacted after review granted found applicable to the EIR at issue].)

---

[8]     The Committee additionally suggests the Town's lack of site-specific environmental analysis is a product of a rushed timeline to meet its deadline for HCD approval of the 2023-2031 Housing Element.  This has no bearing on the adequacy of the EIR.

28

As the Committee points out, however, section 21080.085 provides its rezoning exemption does not apply if the rezoning "would allow for construction to occur within the boundaries of any natural and protected lands as defined pursuant to Section 21067.5." (§ 21080.085, subd. (b)(1)(B).) The parties dispute whether the rezoning of Site H falls within this exception.

We remand this matter to the trial court to decide in the first instance, with the benefit of additional briefing and further development of the record, whether or not the Town's decision to rezone Site H is exempt from CEQA review under section 21080.085. If the Town's decision to rezone Site H is not exempt from CEQA review, the trial court should determine whether substantial evidence supports the Town's findings that the EIR for the General Plan 2040 adequately analyzed the impacts of the proposed amendments to the zoning code and zoning map, and that no supplemental or subsequent EIR was required. (See *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 110 [decision whether conditions for subsequent review under CEQA are present is reviewed for substantial evidence].)

### E. General Plan Consistency

As one court aptly summarized, "[t]he concept of consistency arises in the context of a general plan at two distinct stages. It first arises when a city adopts a general plan. Government Code section 65300.5 provides a general plan and each of its elements must 'comprise an integrated, internally consistent and compatible statement of policies.' 'A general plan is internally inconsistent when one required element impedes or frustrates another element or when one part of an element contradicts another part of the same

29

element.' " (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 619 (*Citizens for Positive Growth & Preservation*).)

Courts must be mindful that "[t]he adoption of a general plan is a legislative act and is presumed valid." (*Citizens for Positive Growth & Preservation, supra*, 43 Cal.App.5th at p. 619.) " 'Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.] A court therefore cannot disturb a general plan based on violation of the internal consistency and correlation requirements unless, based on the evidence before the city council, a reasonable person could not conclude that the plan is internally consistent or correlative.' " (*Id.* at p. 620.)

The Committee's petition alleges the General Plan 2040 is not internally consistent and compatible. The trial court did not address this issue before granting the writ petition, and the parties disagree over whether we should remand or resolve the issue in the first instance. We will remand to obtain the benefit of the trial court's analysis. (See *Ruegg & Ellsworth v. City of Berkeley* (2023) 89 Cal.App.5th 258, 268.)

## DISPOSITION

The judgment granting the petition for writ of mandate is reversed. The matter is remanded with instructions to (1) deny the portion of the petition for writ of mandate challenging the adequacy of the EIR for the General Plan 2040; (2) determine whether or not the Town's decision to rezone Site H is exempt from CEQA review under section 21080.085, and if it is not, determine whether substantial evidence supports the Town's findings that the EIR for the General Plan 2040 adequately analyzed the impacts of the proposed amendments to the zoning code and zoning map and that no

supplemental or subsequent EIR is required; and (3) determine whether or not the General Plan 2040 is internally consistent and compatible.  The Town is entitled to its costs on appeal.

_____

Fujisaki, J.

WE CONCUR:


_____

Tucher, P. J.


_____

Petrou, J.

*Committee for Tiburon LLC v. Town of Tiburon* (A171983)

Trial Court:      Marine County Superior Court

Trial Judge:      Hon. Sheila S. Lichtblau

Counsel:          Burke, Williams & Sorensen LLP, Anna C. Shimko, Benjamin Louis Stock, and Hina Gupta for Defendant and Appellant.

Rutan & Tucker, LLP, Matthew D. Francois for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Attorney General, David Pai, Supervising Deputy Attorney General, Nathaniel Hyman, and John M. Natalizio, Deputy Attorney Generals for California Attorney General, and The California Department of Housing and Community Development as Amici Curiae on behalf of Defendant and Appellant and Real Party in Interest.

Briscoe Prows Kao Ivester & Bazel LLP, Peter Prows, Tony Francois and Nicole Kim for Plaintiff and Respondent.